IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

DEREK M. WILLIAMS,

                    Plaintiff,

        v.                                          OPINION and ORDER

GARY BOUGHTON, TRINA KROENING-SKIME,
DAVID EWING, DANIEL GOFF,                            18-cv-934-jdp
LAURIE NEUROTH, WAYNE PRIMMER,
and STEVEN MEYER,

                    Defendants.[1]

---

Pro se plaintiff Derek M. Williams is a Muslim prisoner who was incarcerated at Wisconsin Secure Program Facility (WSPF) during the events relevant to this case. He alleges that during his time there, WSPF officials burdened his religious practice in various ways, retaliated against him for complaining, and subjected him to unconstitutional conditions of confinement. I granted him leave to proceed on First, Eighth, and Fourteenth Amendment claims, as well as claims under the Religious Land Use and Institutionalized Persons Act (RLUIPA).

Defendants move for summary judgment on all of Williams's claims. Dkt. 25. I will grant the motion in part and deny it in part. Williams has provided evidence from which a reasonable jury could find that defendant Wayne Primmer violated Williams's First and Fourteenth Amendment rights by intentionally refusing to allow him to attend WSPF's Eid al-Fitr celebration in 2018. But no reasonable jury could find in Williams's favor on the various

---

[1] I have updated the caption to reflect defendants' names as indicated in their submissions.

other claims he brings, so I will dismiss them from the case. Williams's case will proceed to trial on his claims against Primmer only.

ANALYSIS

Williams is proceeding on claims related to eight specific incidents or practices that he alleged violated his rights:

1. WSPF officials' refusal to allow Williams to sign up for Ramadan meal bags in 2017;

2. Late delivery of Ramadan meal bags in 2018;

3. Caloric deficiencies in Ramadan meal bags in 2018;

4. Failure to provide Muslim worship leaders or to allow Muslim inmates to serve in their absence;

5. WSPF's prohibition on bringing personal Qurans to congregate religious services;

6. The failure to send inmates on Williams's unit to WSPF's Eid al-Fitr service in 2018;

7. The decision to hold a Muslim religious service in a hot gym during a heat advisory; and

8. WSPF's failure to plan a religious service in honor of Eid al-Adha in 2018.

Based on these eight incidents or practices, I granted Williams leave to proceed on First Amendment free-exercise claims, First Amendment retaliation claims, Fourteenth Amendment equal-protection claims, Eighth Amendment conditions-of-confinement claims, and RLUIPA claims.

Williams contends that defendants failed to challenge and therefore waived any defense to his claims based on (1) the cancellation of a Taleem study group on March 2, 2018, due to the lack of an available volunteer; and (2) the late arrival of Williams and other inmates on his

unit to the Friday service held on July 6, 2018. But defendants responded to Williams's allegations about WSPF's failure to provide Muslim volunteers to lead religious services, which includes the cancellation of the March 2, 2018 Taleem study group. And I didn't permit Williams to proceed on claims based on the delayed attendance at the July 6, 2018 service because he didn't identify the officials responsible for that delay in his complaint. See Dkt. 11, at 12. I conclude that defendants have not waived any objection to Williams's claims.

Williams concedes the claims arising out of the institution's failure to plan a service in honor of Eid al-Adha, *see* Dkt. 41, at 2, so I will dismiss those claims (individual-capacity free-exercise and equal-protection claims against defendant Daniel Goff; and official-capacity free-exercise, equal protection, and RLUIPA claims against defendant Trina Kroening-Skime) from the case. That leaves the claims arising out of the other seven incidents and practices, which I address in turn.

## A. Denial of Williams's request for Ramadan meal bags in 2017

I granted Williams leave to proceed on individual-capacity First Amendment free-exercise claims against defendants David Ewing and Trina Kroening-Skime and a parallel RLUIPA claim for injunctive relief against Kroening-Skime based on Williams's allegation that they refused to add him to the list of inmates slated to receive the Ramadan meal accommodation in 2017. For the reasons explained below, Ewing and Kroening-Skime are entitled to summary judgment on these claims.

### 1. Facts

During Ramadan, observant Muslims fast from sunrise to sunset. WSPF's Food Services department prepares meal bags that are delivered to inmates to consumer after sunset and before sunrise every day of Ramadan. Fasting inmates are provided two meal bags during non-

fasting hours which together provide one day's worth of food. Inmates must sign up in advance for Ramadan meals by submitting a request to their institution's chaplain. Department of Adult Institutions (DAI) Policy and Procedure 309.61.03 governs how facilities administer religious diets: inmates must request an accommodation at least 60 days before the first meal in the special period. This policy applies not only to Ramadan, but to any religious special meal or fasting.

In 2017, Ramadan started on May 26, 2017, so the deadline for signing up for meal bags fell on March 28, 2017. Until May 11, 2017, Williams was housed at Green Bay Correctional Institution (GBCI), so to get on the Ramadan list, Williams needed to submit a request to the chaplain at GBCI. Williams asserts that because he was transferred to a new prison within 60 days of Ramadan, the sign-up deadline didn't apply to him. *See* Dkt. 53, ¶ 26. But the language of DAI Policy 309.61.03 makes clear that such exceptions are permitted only if (1) an inmate was "initially received into DAI custody within 60 days prior to the observance start date," or (2) the inmate submits a request "within five business days of transfer between facilities; and [the] Chaplain/designee is able to confirm the inmate requested accommodation in a timely manner at the prior facility." Dkt. 28-3, at 5.

For the last five days of the signup period, Williams was either in restraints or on observation status, which he says prevented him from signing up before the March 28 deadline. Defendants dispute that these circumstances precluded Williams from signing up by the deadline: they contend that Williams could have signed up earlier, or he could have asked an officer during rounds to pass along Williams's sign-up request to the GBCI chaplain. *See* Dkt. 53, ¶ 57. Regardless, it's undisputed that Williams did not sign up for Ramadan meals by the deadline.

4

On May 11, 2017—44 days after the sign-up deadline and 15 days before the start of Ramadan—Williams was transferred from GBCI to WSPF. Shortly after his arrival, Williams sent WSPF's then-chaplain, defendant Ewing, a sign-up request. Ewing contacted GBCI's chaplain and learned that Williams hadn't signed up for Ramadan that year, so Ewing denied Williams's request. Williams appealed to Kroening-Skime, WSPF's correction programs supervisor, but she likewise rejected his request as untimely. As a result, Williams did not receive the meal accommodation in 2017.

Defendants contend that despite not receiving Ramadan meal accommodation, Williams could have still participated in Ramadan by electing to individually fast in his cell and supplement his diet with canteen purchases. Williams disputes that supplementing his diet with canteen purchases would have been sufficient to allow him to fast. *See* Dkt. 53, ¶ 33.

### 2. RLUIPA claim

I will start with Williams's RLUIPA claim for injunctive relief, because RLUIPA provides broader protection for religious liberty than does the First Amendment. *See Holt v. Hobbs*, 574 U.S. 352 (2015). That means that if Williams's RLUIPA claim fails, his free-exercise claims under the First Amendment would likewise fail. *See Tanksley v. Litscher*, No. 15-cv-126-jdp, 2017 WL 3503377, at *3 (W.D. Wis. Aug. 15, 2017). Williams has been transferred from WSPF since filing this lawsuit, but the 60-day Ramadan-meal sign-up deadline applies to all Wisconsin prisons, so his claim for injunctive relief is not moot.

RLUIPA prohibits prison officials from "impos[ing] a substantial burden on the religious exercise" of an inmate "unless the government demonstrates that imposition of the burden on that person . . . is the least restrictive means of furthering [a] compelling government interest." 42 U.S.C. § 2000cc-1(a); *see also Grayson v. Schuler*, 666 F.3d 450, 451 (7th Cir.

2012). To prove a RLUIPA claim, the plaintiff has the initial burden to show that he has a sincere religious belief. *Holt*, 574 U.S. at 360–61. The parties do not dispute that Williams has a sincere belief that fasting during Ramadan is a practice required by his faith. Williams also has the burden to show that DOC's policies substantially burden his religious exercise. *See Koger v. Bryan*, 523 F.3d 789, 796 (7th Cir. 2008). And for purposes of summary judgment, defendants don't dispute that Williams's religious exercise was substantially burdened by the denial of Ramadan meal bags.

Williams has established a prima facie case under RLUIPA, so the burden is on defendants to show that their rules are the least restrictive means of furthering a compelling governmental interest. *Id.* Defendants contend that the 60-day sign-up deadline serves the DOC's compelling interests in orderly prison administration and cost control. They provide a detailed account of the considerable advanced planning that goes into ordering food and preparing meals for the 23,000 inmates in their custody, and of the three-month-long process of preparing for the Ramadan meal accommodation specifically. *See* Dkt. 53, ¶¶ 35–51. They say that allowing inmates to sign up late for Ramadan would "wreak havoc on the process of preparing for Ramadan meals because Food Service would not be able to plan accordingly to meet the food production needs for both the general menu and Ramadan participants." *Id.* ¶ 52.

Williams doesn't dispute that the 60-day deadline is necessary to enable Food Services to adjust the quantities and types of food it orders to meet inmates' needs during Ramadan. Dkt. 53, ¶ 34. Instead, he contends that subjecting him to that deadline is unlawful. He argues that he was justified in missing the sign-up deadline in 2017 because he was suffering from unrelated mental health issues that caused him to be in restraints or under observation, which

meant that he was unable to submit a written request to the chaplain. But that doesn't explain why he didn't try to sign up further in advance of the deadline (before his mental health crisis), why he didn't ask the officers he came into contact with while in observation to communicate his request to the chaplain, or why he waited another 44 days after the deadline to lodge his request. Williams says that the institution is capable of making exceptions, and that the impact of a few late sign-ups wouldn't make a difference to WSPF's multi-million-dollar budget. But if the institution were to make an exception for Williams, it would have no basis to deny the exception to other inmates. The cumulative effect of late sign-ups would undermine the institution's ability to plan for Ramadan and other religious observances.

Citing the Court of Appeals for the Seventh Circuit's opinion in *Conyers v. Abitz*, Williams notes that prison officials may not simply rest on the "rigid and unsupported assumption that a sign-up deadline like the one imposed is a reasonable administrative requirement under any circumstances." Dkt. 41, at 3 (citing 416 F.3d 580, 585 (7th Cir. 2005)). This is an accurate statement of law, but it doesn't reflect the situation in this case. In *Conyers*, the defendants' evidence in support of the sign-up deadline was "too poorly developed to support a decision in their favor." 416 F.3d at 585. Here, by contrast defendants have developed substantial evidence that the sign-up deadline is critical to the DOC's ability to provide religious meal accommodations in the first place.

In a case I decided earlier this year involving nearly identical facts, I held that the 60-day sign-up deadline does not violate RLUIPA: "[P]rison officials need a reasonably firm deadline, because they would not be able to accommodate a large number of late requests. After all, a late request to be placed on the Ramadan list is a late request for 60 special meals." *Dangerfield v. Ewing*, No. 18-cv-737-jdp, 2020 WL 94758, at *4 (W.D. Wis. Jan. 8, 2020)

(citation omitted).[2] Here, as in *Dangerfield*, the undisputed evidence shows that the 60-day deadline is the least restrictive means of achieving the DOC's compelling interests. So I will grant summary judgment to defendants on the RLUIPA claim arising out of the denial of Williams's request for the Ramadan meal bags in 2017.

### 3. First Amendment free-exercise claim

In addition to his RLUIPA claim, Williams brings First Amendment free-exercise claims for damages against defendants Ewing and Kroening-Skime based on the denial of Ramadan meal bags in 2017. To survive a motion for summary judgment on his free-exercise claim, Williams must "submit evidence from which a jury could reasonably find that the defendants personally and unjustifiably placed a substantial burden on his religious practices." *Neely-Bey Tarik-El v. Conley*, 912 F.3d 989, 1003 (7th Cir. 2019) (citation omitted). A substantial burden is one that "put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Thomas v. Review Bd.*, 450 U.S. 707, 718 (1981). In the prison context, such a burden is justified if it is "reasonably related to a legitimate penological interest." *Thompson v. Holm*, 809 F.3d 376, 379 (7th Cir. 2016) (citing *Turner v. Safley*, 482 U.S. 78, 89–91 (1987)).

Here, Williams's free-exercise claim fails for the same reasons as his RLUIPA claim: the 60-day deadline is reasonably related to the state's interest in having enough time to plan, budget for, and prepare religious meals. Even if defendants had failed to make this showing, I

---

[2] Williams argues that I held the 60-day sign-up deadline unconstitutional in *Brim v. Donovan*, No. 15-cv-658-jdp, 2017 WL 3972519 (W.D. Wis. Sept. 7, 2017), but that is not accurate. I denied defendants' motion for summary judgment in that case because there was a factual dispute about whether Brim had missed the 60-day deadline and because defendants hadn't provided evidence showing a valid, rational connection between the 60-day deadline and the institution's needs. *See id.* at *8. I didn't deem the deadline unconstitutional, nor did I rule out the possibility that the DOC might make the requisite evidentiary showing in future cases.

would nonetheless grant them summary judgment under the doctrine of qualified immunity. That doctrine shields officials from civil liability so long as their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Mullenix v. Luna*, --- U.S. ----, 136 S. Ct. 305, 308 (2015) (internal quotation omitted). A clearly established right is one that is sufficiently clear such "that every reasonable official would have understood that what he is doing violates that right." *Reichle v. Howards*, 566 U.S. 658, 664 (2012). In other words, "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).

Williams bears the burden of demonstrating that his rights were clearly established to overcome qualified immunity. *See Hernandez ex rel. Hernandez v. Foster*, 657 F.3d 463, 473 (7th Cir. 2011). He does not identify a Supreme Court or Seventh Circuit Court of Appeals case that clearly establishes that denying an inmate's untimely request for special religious meals violates the First Amendment's free-exercise clause. And I have concluded in other decisions that no such cases exist. *See Lee v. Ewing*, No. 18-cv-370, 2019 WL 4737057, at *8 (W.D. Wis. Sept. 27, 2019). So I will grant defendants' motion for summary judgment on Williams's free-exercise claim about the denial of his request for Ramadan meal bags in 2017.

## B. Timing of Ramadan meals in 2018

Williams was able to sign up for Ramadan meal bags in 2018, but he alleges that those meal bags were routinely delivered late so that he and other inmates were given only minutes to eat prior to the start of the fast, or were left waiting for food long after the end of the fast. Based on these allegations, I granted Williams leave to proceed on claims against Ewing, Kroening-Skine, and Laurie Neuroth (WSPF's food services manager during the period in question) on claims under: (1) RLUIPA; (2) the First Amendment; and (3) the Eighth

9

Amendment, as well as parallel official-capacity claims for injunctive relief against Kroening-Skine. Because the undisputed facts show that the Ramadan meal delivery times did not substantially burden Williams's religious practice or pose an objectively serious risk of harm to him, I will grant summary judgment to defendants and dismiss these claims.

### 1. Facts

In 2018, Ramadan started on May 16 and ended on June 14. Over the course of the month, the start and end times of the fast varied—as the days grew longer, the fast started earlier in the morning and broke later in the evening. Defendants provide a chart listing the meal delivery times in 2018 (as reflected in the unit logbook) relative to the fast start and end times. *See* Dkt. 53, ¶ 65.

### a. Morning meal bags

According to the chart, on all but two mornings (for which delivery times aren't clear because they weren't noted in the unit logbook), morning meal bags were delivered to inmates at least 20 minutes before the start of the fast, which is the minimum amount of time WSPF gives inmates to eat general fare meals. On average, meals were delivered to the unit 47 minutes prior to the start of the fast, with the earliest deliveries arriving more than an hour in advance and the shortest arriving with 30 minutes to spare. Defendants say that it generally takes less than ten minutes to pass out Ramadan meal bags because few inmates receive them. *Id.* ¶ 67. Williams disputes this and says that it actually takes "twice as long," *id.*, but he doesn't dispute that he had at least 20 minutes to eat his morning meal bag prior to the start of the fast each morning. *Id.* ¶ 64.

### b. Evening meal bags

For evening meal bags, the chart contains delivery time data for 21 of the 30 days of Ramadan. (On the other nine days, staff failed to record the time that the meal delivery began.) The chart indicates that on 11 of those 21 days, evening meal bags were delivered more than ten minutes before the fast ended, meaning that every inmate would have received his evening meal prior to the fast breaking. The meal bags arrived within ten minutes of the end of the fast on six of the remaining ten days, and within 25 minutes of the end of the fast on three days. There was only one day on which inmates received their Ramadan meals substantially later; on May 28, 2018, the meal bags weren't delivered until more than an hour after sundown due to staffing and kitchen issues.

Williams doesn't appear to dispute the  accuracy of the evening meal bag delivery times reflected on defendants' chart, but he argues that it should be assumed that the meal bag deliveries occurred late on the nine dates for which no time entries are reflected in the logbook. *Id.* ¶ 70. By that metric, he asserts that meal bags were brought "well after the time of fasting ending" on nearly two-thirds of the nights of Ramadan. *Id.*

### 2. RLUIPA and First Amendment free-exercise claims

Defendants contend that the delivery times of the Ramadan meals in 2018 did not place a substantial burden on Williams's practice of Ramadan for purposes of RLUIPA or the First Amendment. A substantial burden is one that "put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Thompson*, 809 F.3d at 379 (citations omitted). Williams doesn't explain in his brief or his supporting materials how these meal delivery times exerted pressure on him to modify his religious practice, and the evidence indicates that the meal delivery times posed, at most, a mild inconvenience for Williams.

11

Williams always had at least 20 minutes to eat his morning meal bag prior to the start of the fast, which is the amount of time that inmates receiving general fare meals are given to eat. Williams doesn't argue that his religious practice is substantially burdened by having the same amount of time to eat as inmates do under ordinary circumstances. So defendants are entitled to summary judgment on the RLUIPA and First Amendment claims arising out of the morning meal bag deliveries.

As for evening meals, Williams correctly notes that sometimes the evening meal bags arrived after the end of the fast. But Williams doesn't explain how this burdened his religious practice; indeed, he doesn't even allege that he experienced additional hunger as a result of these delays. The week before Ramadan began, Williams made substantial food purchases from WSPF's canteen. *See* Dkt. 53, ¶ 71 (no dispute that on May 15, 2018, Williams purchased seven packs of chili ramen, two packs of instant white rice, two packs of chocolate chip cookies, barbeque sauce, two bags of barbeque chips, two bags of Doritos, four packets of horseradish, two cans of chili with beans, two packs of twin beef sticks, a box of swiss rolls, and two jalapeno cheese bars). He made similar food purchases over the subsequent weeks of Ramadan. *Id.* ¶ 72. If Williams's evening meal bag didn't arrive promptly on or before the end of the fast, he had canteen items to break his fast with.

Williams's argument appears to be that WSPF had an obligation to precisely align the delivery of his meal bag with the end of the fast, but that is not what the law requires. WSPF's obligation under RLUIPA and the First Amendment was to ensure that Williams's religious practice wasn't substantially burdened in the absence of a compelling or legitimate government interest. Mere inconvenience—such as not having one's meal bag the minute the fast ends— isn't a substantial burden, especially when an inmate has plenty of his own food items available.

*See Vision Church v. Vill. of Long Grove*, 468 F.3d 975, 999 (7th Cir. 2006) ("a burden must be more than a mere inconvenience to rise to the level of a constitutional injury"). So defendants are also entitled to summary judgment on the RLUIPA and First Amendment claims arising out of the evening meal bag deliveries.

### 3. Eighth Amendment conditions-of-confinement claims

These same facts show that defendants are entitled to summary judgment on Williams's Eighth Amendment conditions-of-confinement claims arising out of the timing of the 2018 Ramadan bag meal deliveries. The Eighth Amendment guarantees inmates the "minimal civilized measure of life's necessities," *Townsend v. Fuchs*, 522 F.3d 765, 773 (7th Cir. 2008), including a diet with adequate nutrition. *Mays v. Springborn*, 575 F.3d 643, 648 (7th Cir. 2009). To show that a prison has denied the minimal civilized measure of life's necessities, an inmate needs evidence that he faced an objectively serious risk of harm and that officials knew about it and could have prevented it but did not. *Id.* Here, Williams has shown no objectively serious risk of harm arising out of the timing of the Ramadan meal bag deliveries. Williams hasn't produced evidence that even he went hungry as a result of the delayed deliveries, let alone that the delays posed an objectively serious risk of harm. I will grant summary judgment to defendants on Williams's Eighth Amendment claims.

## C. Caloric content of Ramadan meals in 2018

In addition to challenging the timing of the deliveries of the Ramadan meal bags in 2018, Williams alleged that those bags contained fewer calories than what was listed on the menu and what was provided in the general fare meals. Based on these allegations, I allowed Williams to proceed on individual-capacity claims against Ewing, Kroening-Skime, and Neuroth under (1) the First Amendment Free Exercise Clause; (2) the Eighth Amendment; and

13

(3) the Fourteenth Amendment's Equal Protection Clause, as well as official-capacity claims against Kroening-Skime under all three constitutional theories. At summary judgment, the evidence shows that defendants violated none of these constitutional provisions, so I will grant defendants' motion and dismiss these claims.

### 1. Facts

During Ramadan, the DOC modifies the menu so that participating inmates receive two meals for the day instead of three. In 2018, Neuroth was responsible for creating the menu for Ramadan meals at WSPF. Per the DOC's diet manual, the target calories per day for all menus is between 2,500 and 2,700 calories. In crafting the 2018 Ramadan menu, Neuroth understood the manual as requiring that the average weekly caloric intake for the Ramadan meals exceed 2,500 calories per day, and she crafted a menu that she believed complied with this requirement. As it turns out, Neuroth admits that she made a handful of data entry errors when entering the menu into Computrition, the prison's meal planning software. For example, the nutrients that Neuroth entered into the system for bread served at the prison was for homemade bread whereas WSPF purchased bread, leading to a discrepancy in the number of calories listed and the number of calories inmate actually received. Neuroth attributes these errors to the fact that she was new to the food services administrator position and still learning how to use Computrition.

Williams noticed the discrepancy between the calories listed on the Ramadan menu and the actual number of calories the bags contained. He submitted an inmate complaint, which the institution ultimately affirmed after the DOC's dietetic services director verified that the DOC's master Ramadan menu averaged 2,587 calories per day, whereas the WSPF Ramadan menu varied from 2,410 to 2,706 calories and averaged 2,526 calories per day—61 calories

14

lower than the DOC master Ramadan menu. Williams disputes that the shortfall was only 61 calories and asserts that "some days there was a 175 cal[orie] discrepancy and some days it could have been more." Dkt. 53, ¶ 82. But that observation is not inconsistent with defendants' assertion that—on average—the shortfall was 61 calories, with higher discrepancies on some days and lower discrepancies on others. After discovering the discrepancy, DOC's dietetic services director worked with Neuroth to update the menu to reflect the accurate calorie values. She also reviewed draft Ramadan menus for WSPF in 2019 and 2020 to ensure that WSPF didn't make any similar mistakes.

### 2. First Amendment free-exercise claims

Williams's First Amendment free-exercise claims based on the nutritional content of the Ramadan meal bags fail for the same reason his meal bag delivery timing claims failed: Williams has failed to show any substantial burden on his religious practice. He does not contend that he experienced hunger as a result of the calorie shortfall, let alone that the shortfall was significant enough to pressure him to violate his beliefs by ceasing his fast and switching to general fare meals. The lowest daily calorie total that Williams experienced during Ramadan was 2,410 calories—only twenty calories fewer than the 2,430 calories that a man of Williams's age and height would need to maintain an ideal body weight according to the DOC's dietetic services director. *Id.* ¶¶ 89, 83. This, in combination with the fact that Williams was free to supplement his diet with items purchased from the canteen,[3] demonstrates that any burden posed by the caloric deficiencies in the 2018 Ramadan bag meals was too insignificant to constitute a substantial burden under the First Amendment.

---

[3] It is undisputed that during the period in question (May 16 through May 29, 2018), Williams purchased almost $40 worth of groceries from the canteen. Dkt. 29-4, at 2, 4.

### 3. Eighth Amendment conditions-of-confinement claims

These facts are likewise fatal to Williams's Eighth Amendment claims. Williams does not contend that he went hungry as a result of the calorie shortfalls in the Ramadan bags, and the evidence shows that the shortfalls were too minor to have affected Williams's health in any meaningful way. In the absence of any objectively serious risk of harm, Williams's Eighth Amendment claims fail.

### 4. Fourteenth Amendment equal-protection claims

To establish a prima facie case of discrimination under the equal protection clause, the plaintiff must show (1) that he is a member of a protected class; (2) that he is otherwise similarly situated to members of the unprotected class; and (3) that he was treated differently from members of the unprotected class. *Brown v. Budz*, 398 F.3d 904, 916 (7th Cir. 2005) (citation omitted). The plaintiff must also put forward evidence of discriminatory intent—that is, evidence that a defendant "selected a particular course of action at least in part because of its adverse effects upon an identifiable group." *Alston v. City of Madison*, 853 F.3d 901, 907 (7th Cir. 2017) (citation and quotation marks omitted).

Here, Williams puts forward no evidence that Neuroth intended to discriminate against Muslim inmates when she created the Ramadan menu. Rather, he concedes that the calorie discrepancies were due to a mistake that Neuroth made because she was new to the food services administrator position and still learning how to use Computrition. Dkt. 53, ¶ 85. Williams notes that Neuroth had worked in food services since 1999 and suggests that she should have known better than to make such an elementary mistake. Dkt. 44, ¶ 113. But that goes to the issue of negligence, not discriminatory intent. Negligence is not enough to sustain a claim under 42 U.S.C. § 1983. *Daniels v. Williams*, 474 U.S. 327, 333–34 (1986). Because

16

there is no indication that Neuroth acted with discriminatory intent, I will grant defendants summary judgment on Williams's Fourteenth Amendment equal-protection claim based on the caloric deficiencies in the Ramadan meals in 2018.

**D. Failure to provide Muslim worship leaders and refusal to permit inmates to serve in their absence**

In his complaint, Williams alleged that defendants denied him the conditions and resources necessary to practice his faith through religious services and study groups. His complaint was threefold. First, Williams alleged that WSPF was routinely unable to recruit Muslim volunteers for the community to lead Friday Jumu'ah services or Taleem study groups. Second, Williams alleged that one of WSPF's solutions to the volunteer shortage—broadcasting the Jumu'ah services over a television livestream—didn't comport with Islamic custom and burdened Williams's religious practice. Third, he alleged that defendants refused to permit Muslim inmates to carry out religious services and study groups on their own, outside the presence of a television or a volunteer, even though WSPF allowed inmates of other religions to do so. Based on these allegations, I granted Williams leave to proceed on (1) individual-capacity First Amendment free-exercise claims; (2) individual-capacity Fourteenth Amendment equal-protection claims; and (3) official-capacity free-exercise and equal-protection claims, along with a RLUIPA claim for injunctive relief.

**1. Facts**

The DOC authorizes two types of weekly congregate religious services for Muslim inmates: Jumu'ah Salat—an Islamic congregational prayer service held on Fridays and led by an imam; and Taleem—a smaller religious study group that is generally held on a weekly basis. Institutions rely on community volunteers to come in and facilitate these services and study

groups. Unfortunately, during Williams's time at WSPF between 2017 and 2019, WSPF had difficulty recruiting community volunteers to provide these services on a weekly basis.

When WSPF couldn't find a volunteer imam for the Friday Jumu'ah service, it would provide a televised livestream of the service being held at Fox Lake Correctional Institution, which employs a Muslim chaplain. Williams and others objected to this practice, arguing that it wasn't a genuine Jumu'ah service because it was not conducted in person. There were also occasional problems with the video feed. Ewing says that when the livestream malfunctioned, he would permit volunteer inmates to read a pre-approved English excerpt from the Quran.[4] As for the Taleem study groups, Ewing asserts that when he was unable to find a Muslim volunteer, he would supervise the study groups himself. Williams says that sometimes the Taleem study groups were nonetheless canceled. *Id.* ¶ 107.

Williams says that canceling services or using a livestream should never have been necessary because he was capable of leading religious services himself. Dkt. 54, ¶ 27. He is well-versed in the tenets of Islam and has extensive experience leading prayers and teaching religious doctrine. *Id.* ¶¶ 6–12. But DAI policy makes clear that "[u]nder no circumstances will inmates be authorized to lead or conduct a Religious Service or Study Group." Dkt. 28-1, at 5 (DAI Policy 309.16.01). Community volunteers may "structure appropriate inmate participation in various aspects of religious programming," but inmate roles "must be planned, scripted, or otherwise pre-approved by the Chaplain/designee prior to the event." *Id.* at 12. For example,

---

[4] Williams disputes that this was Ewing's practice and says that WSPF started permitting inmates to read from the Quran aloud only when Goff replaced Ewing as chaplain in 2018. Dkt. 53, ¶ 110. But that assertion is contradicted by Williams's own evidence. In a letter he wrote to WSPF staff prior to Ewing's retirement, Williams stated that "by directive of Chaplain Ewing, the Muslim inmates are allowed to read from the Quran and then conduct the congregational prayer" when the livestream malfunctions. Dkt. 44-28, at 1.

depending on the religious tradition in question, an inmate might be allowed to call the prayer, carry the pipe, sing in a choir, read a designated passage, perform as a musician, participate in rituals, or act as the fire starter. *Id.*

This policy attempts to "distinguish safely structured inmate participation from problematic inmate leadership," on the view that allowing inmate-led religious services would create unacceptable security risks and undermine prison administration. Dkt. 53, ¶¶ 122, 123. Specifically, the DOC contends that allowing inmates to lead other inmates in any type of prison activity would facilitate unequal power dynamics and foster problematic group leadership structures. There are also concerns that inmate leaders might use congregate religious services or study groups to conduct gang or racial hate group communications or disseminate subversive information or contraband. Williams says that in his experience, problems of this nature have never occurred among Muslim inmates. *Id.* ¶¶ 125, 126.

## 2. RLUIPA and official-capacity claims

The events relevant to this case occurred at WSPF, but Williams is no longer incarcerated there. In May 2019, Williams was transferred to Columbia Correctional Institution (CCI). At CCI, there are two community volunteers who lead Jumu'ah services. Both volunteers have prepared written sermons for inmates to read when there is no volunteer available—a practice that the deputy warden has deemed permissible participation under DAI Policy 309.16.01. As a result, CCI rarely relies on the video feed from Fox Lake Correctional Institution. In the meantime, back at WSPF, Goff managed to recruit two volunteer imams to come to WSPF on a regular basis to deliver Jumu'ah, so he has not used the video feed much since taking over as chaplain either.

Defendants contend that these developments render Williams's RLUIPA and official-capacity claims moot. These are claims for prospective relief, and to obtain prospective relief, there must be a risk that the defendant will violate the plaintiff's rights again. *Lopez-Aguilar v. Marion Cty. Sheriff's Dep't*, 924 F.3d 375, 395 (7th Cir. 2019). When a prisoner's claim relates to events at a particular prison, the general rule is that any request for prospective relief becomes moot if a prisoner is transferred because it is so unlikely that the prisoner will be subjected to the same conditions again. *Maddox v. Love*, 655 F.3d 709, 716–17 (7th Cir. 2011); *Ortiz v. Downey*, 561 F.3d 664, 668 (7th Cir. 2009). Williams contends that defendants "have presented nothing showing plaintiff will not . . . be returned to WSPF." Dkt. 41, at 12. But it is the prisoner's burden to "demonstrate that he is likely to be retransferred," and [a]llegations of a likely retransfer may not be based on speculation." *Higgason v. Farley*, 83 F.3d 807, 811 (7th Cir. 1996) (citations and quotation marks omitted). Even if Williams were transferred back to WSPF, the evidence shows that Goff has managed to remedy the volunteer shortage.

Williams says that his claims for prospective relief aren't moot because "almost all" are a direct result of policies that apply statewide. Dkt. 41, at 12. But he doesn't contend that he has experienced a similar pattern of televised or cancelled religious services since his transfer to CCI, and the evidence produced by defendants suggests that CCI has been able to accommodate Williams's religious practice. Because there is no suggestion that Williams will be subject to these burdens moving forward, I will dismiss Williams's RLUIPA and official-capacity claims as moot.

### 3.  First Amendment free-exercise claims

As discussed above, prevailing on a claim under the Free Exercise Clause requires a plaintiff to show that the challenged restriction is not reasonably related to a legitimate

penological interest. In evaluating whether a challenged regulation or restriction is reasonably related to a legitimate penological interest, courts analyze the four factors established in *Turner v. Safley*, asking (1) whether there is a "valid, rational connection" between the restriction and a legitimate government interest; (2) whether the prisoner retains alternatives for exercising the right; (3) the impact that accommodation of the right will have an prison administration; and (4) whether there are other ways that prison officials can achieve the same goals without encroaching on the right. 482 U.S. at 89–91. As I explained to Williams in my screening order, there is some uncertainty in the law about whether there are additional elements a plaintiff must prove to establish a free-exercise claim in the prison context, *see* Dkt. 11, at 10–11. But I need not resolve that uncertainty in this opinion because I conclude that all four of the *Turner* factors weigh in defendants' favor.

Defendants contend that they are entitled to summary judgment on Williams's free-exercise claims because the accommodations that WSPF provided for Jumu'ah and Taleem, and the limitations on those accommodations, were reasonably related to legitimate penological interests. On the first *Turner* factor, defendants argue that there was a valid, rational connection between the restrictions it imposed when no volunteer was available to lead or supervise a religious event (i.e., livestreaming Jumu'ah services and occasionally cancelling Taleem study groups) and the DOC's legitimate interest in avoiding the risks associated with giving inmates' leadership responsibilities in religious matters. These risks aren't just speculative: defendants provide evidence that prisons in Pennsylvania, Michigan, Virginia, and Nebraska had negative experiences with inmate-led religious services, including gang infiltration of religious groups and violent altercations at inmate-led services. Dkt. 53, ¶¶ 129–33.

21

Williams objects to this evidence as irrelevant because defendants have produced no evidence that he individually or Muslim inmates in DOC custody collectively would pose such risks. He also notes that he has previously led group activities while in prison without incident, tutoring up to four inmates at a time and facilitating Taleem study groups of up to eight people without staff supervision. *Id.* ¶ 124. (He does not explain whether he had permission from WSPF staff to lead these eight-person Taleem groups.) But "prison officials need not wait for a problem to arise before taking steps to minimize security risks." *Hadi v. Horn*, 830 F.2d 779, 785 (7th Cir. 1987) (holding that a prison's decision to cancel a Jumu'ah service altogether in the absence of an imam had a valid, rational connection with a legitimate penological interest). Williams doesn't meaningfully contest the legitimacy of the DOC's asserted interest, or the existence of a valid, rational connection between that interest, the limitations that the DOC places on inmate leadership, and the ways in which WSPF modifies its religious programming to account for those limitations.

Regarding the second *Turner* factor, Williams had alternate means of practicing Islam available to him. He could follow a halal diet, fast for Ramadan, engage in individual mediation or prayer, read religious texts, correspond with other Muslims, seek out pastoral care, and request to abstain from work or other activities on days of religious observance. So even if Williams found the televised Jumu'ah services less than ideal, or found that his weekly Taleem study group had been cancelled for lack of a volunteer, he still had means of practicing his faith. *See O'Lone v. Estate of Shabazz*, 482 U.S. 342, 352 (1987) (although there were no alternative means for prisoners to attend Jumu'ah services, "[t]he record establishe[d] that [they were] not deprived of all forms of religious exercise, but instead freely observe a number of their religious traditions"); *Hadi*, 830 F.2d at 786 (occasional cancellation of Jumu'ah

services due to absence of Muslim chaplain did not infringe on plaintiffs' free exercise where prisoners were permitted to observe Ramadan and Eid-al-Fitr, had access to religious materials, pastoral care, and religious study classes).

The third and fourth *Turner* factors likewise weigh in defendants' favor. Allowing inmates to serve as imams for Jumu'ah services or to facilitate Taleem study groups would undermine the safety and security needs of the prison. *See id.* (noting that if Muslim inmates were permitted to lead Jumu'ah services, the prison "would also have to extend this right to other religious groups which would most likely demand equal treatment. This ripple effect would end up compounding the security problems that underlie" the prohibition on inmate leadership. (internal citation omitted)). And given the shortage of available volunteer worship leaders from the community during the period under review, there were no obvious, less restrictive alternatives WSPF could have employed to protect its interest in safety and security short of televising Jumu'ah services and occasionally cancelling Taleem study groups.

Based on these facts, no reasonable jury could conclude that use of a television livestream for Jumu'ah services or the occasional cancellation of Taleem services infringed on Williams's right to free exercise. Even if Williams had met his burden of showing a First Amendment violation, defendants are nonetheless entitled to qualified immunity. Williams does not cite, nor have I found, any cases suggesting that inmates have a clearly established First Amendment right to inmate-led religious services. Indeed, controlling case law holds precisely the opposite. *See Hadi*, 830 F.3d at 784–85. So I will grant summary judgment to defendants on these claims.

### 4.  Fourteenth Amendment equal-protection claims

In his complaint, Williams alleged that WSPF prohibited Muslims from engaging in communal prayer outside the presence of a volunteer or use of a television livestream, but allowed inmates of other religions to engage in group religious activities unsupervised. But at summary judgment, the only evidence Williams provides in support of this assertion is a declaration from a member of the Native American religious group, who says that per their religious practice, two inmates perform "ceremonial prerequisites" to their pipe and drum ritual by "smudg[ing] everyone down with sage" and "set[ting] everything up to load the pipe with a recitation." Dkt. 47, ¶ 5. No community volunteers come in to lead the ritual, and although Chaplain Ewing is sometimes present, he "does not direct, dictate, or coordinate any aspect" of the service. *Id.* ¶ 8. Rather, the inmates themselves "carry out all Native American traditional practices." *Id.* ¶ 9.

This is not a relevant comparison. Allowing inmates to individually perform routine, nondiscretionary functions (like setting up for a ceremony) or to collectively perform group rituals (like a pipe and drum ritual) is consistent with the restrictions DAI Policy 309.16.01 imposes on inmate leadership. Williams provides no evidence that inmates from other religious groups are permitted to individually lead congregate religious services in the way that a Muslim imam, a Jewish rabbi, or a Christian pastor does. Absent evidence that WSPF in fact treats similarly situated religious groups differently, Williams cannot make a prima facie case of discrimination under the Fourteenth Amendment. Defendant are entitled to summary judgment on the Fourteenth Amendment claim.

### E. Prohibition on bringing personal Qurans to congregate religious services

In his complaint, Williams alleged that defendants Ewing, Kroening-Skime, and Steven Meyer fabricated a policy prohibiting inmates from bringing their personal copies of the Quran to Jumu'ah services. I granted Williams leave to proceed on individual-capacity First Amendment retaliation claims based on his allegation that defendants created this policy to punish him for a letter of complaint he submitted on January 5, 2018, as well as individual-capacity Fourteenth Amendment equal-protection claims based on his allegation that the policy was intended to discriminate against him as Muslim.

#### 1. Facts

Under institution policy, inmates are permitted to possess personal religious texts, including the Quran. Originally, inmates were permitted to bring these personal religious books to congregate religious services, but at some point, WSPF staff became concerned that inmates were bringing other items in addition to their personal religious property and passing the items to each other during services. Specifically, inmates in the Native American religious group were bringing unnecessary items to their sweat lodges and exchanging them with each other. Inmates aren't permitted to transfer personal property back and forth in prison without authorization by staff. *See* Wis. Admin. Code § DOC 303.40. Defendants say that in response to these concerns, Ewing instructed WSPF staff to stop permitting inmates to bring personal religious books and items to congregate religious services.

Williams disputes that this was the real reason for the new rule. He asserts that the prohibition was implemented to retaliate against him for complaint he had submitted to WSPF staff on January 5, 2018. *See* Dkt. 44-28. In that complaint, Williams complained that Meyer, a correctional officer, had rudely interrupted the Muslim inmates in the middle of the January 5

Jumu'ah service. One week later, on January 12, Meyer informed Williams that per a directive from Ewing, inmates would no longer be able to bring their personal Qurans to Jumu'ah services. Williams wrote to Ewing and Kroening-Skime to ask that they provide him with a copy of this new policy, Dkt. 44-21, but no copy of the policy was ever produced. Williams also asserts that WSPF continued to allow non-Muslims to bring personal religious texts to religious services.

### 2. First Amendment retaliation claims

To prevail on a First Amendment retaliation claim, a plaintiff must identify (1) the constitutionally protected activity in which he was engaged; (2) one or more retaliatory actions taken by the defendant that would deter a person of "ordinary firmness" from engaging in the protected activity; and (3) sufficient facts to make it plausible to infer that the plaintiff's protected activity was one of the reasons defendant took the action he did against him. *Bridges v. Gilbert*, 557 F.3d 541, 556 (7th Cir. 2009). Defendants don't dispute that Williams engaged in protected activity when he submitted a written complaint on January 5, nor do they argue that barring inmates from bringing personal Qurans to Jumu'ah services would deter a person of ordinary firmness from engaging in that activity. Instead, they contend that Williams doesn't have evidence sufficient to satisfy the third element.

To survive summary judgment, Williams needs evidence that Ewing's directive regarding personal religious items was prompted at least in part by Williams's January 5 letter. Williams identifies four pieces of evidence that he believes give rise such an inference. First, he notes that defendants failed to provide a written copy of the new policy on personal Quarans when he asked for it, which he says shows that the policy was fabricated to penalize him. Dkt. 54, ¶ 105. But defendants never asserted that there was a written policy; they said only

that Ewing implemented a new practice. Ewing's failure to memorialize the new practice in writing doesn't suggest that the practice was concocted to retaliate against Williams.

Second, Williams says that the ban on bringing personal religious books to services applied only to Muslims and not to inmates of other denominations, which suggests that the ban was specially targeting him. But defendants contend that the ban applied to all religious groups on an equal basis: Pagan inmates were barred from bringing their personal Book of Shadows to their congregate services; Catholic inmates were barred from bringing personal Bibles to mass; and Native American inmates were barred from bringing any personal items to the sweat lodge (except for a jacket, socks, and shoes if the weather was cold). Dkt. 53, ¶ 193. Williams doesn't rebut this evidence. He provides declarations from two Christian inmates who say that they have historically been permitted to bring Bibles to Protestant and Catholic services, respectively. *See* Dkt. 48 and Dkt. 49. But both declarations were signed and dated in early March 2018, less than two months after the prohibition on personal religious books went into effect (and more than two years before defendants moved for summary judgment in this case). Neither inmate explains whether he had attended congregate religious services in the few weeks since the prohibition had been implemented, let alone whether he had been permitted to bring his personal Bible with him to those services.

Third, Williams says that defendants' purported concerns about inmates bringing contraband to congregate religious services were fabricated. He notes that defendants haven't provided evidence that Muslim inmates were using their personal Qurans to exchange contraband. Dkt. 54, ¶ 104. But Ewing states that it was misconduct by Native American inmates that prompted him to implement the general prohibition on personal religious books and items at congregate religious services. Muslim inmates may not have engaged in the specific

27

conduct that Ewing was concerned about, but it doesn't follow that Ewing implemented the practice to retaliate against Williams. Williams contends that there's no evidence of misconduct by the Native American inmates, *id.* ¶ 112, but that's not true: Ewing discusses this misconduct in his declaration. *See* Dkt. 34, ¶ 54. Williams provides no evidence that undermines Ewing's account.

Fourth, Williams contends that the timing of the prohibition is suspicious because it followed so closely on the heels of his January 5 complaint. But "suspicious timing will rarely be sufficient in and of itself to create a triable issue." *Kidwell v. Eisenhauer*, 679 F.3d 957, 966 (7th Cir. 2012). Williams submitted letters, interview requests, and grievances frequently. It is not surprising that the prohibition on personal religious books was implemented close in time to one of those complaints. Williams's June 5 letter discussed disrespectful conduct by Meyer and had no apparent connection to the use of personal Qurans. Williams can do no more than speculate that the prohibition on personal Qurans was related to his letter, and speculation isn't sufficient to survive summary judgment. *See Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008). So I will grant summary judgment to defendants on Williams's First Amendment retaliation claims.

### 3. Fourteenth Amendment equal-protection claims

Williams's Fourteenth Amendment equal-protection claims are based on his allegation that the ban on personal religious books applied only to Muslim inmates. But as already discussed, Williams fails to rebut defendants' evidence that the prohibition in fact applied to all inmates regardless of religious denomination. Because Williams hasn't made out a prima facie case of discrimination under the Fourteenth Amendment, defendants are entitled to summary judgment his equal-protection claims.

28

**F.  Primmer's failure to send Williams to Eid al-Fitr service in 2018**

I granted Williams leave to proceed on First Amendment free-exercise, RLUIPA, and Fourteenth Amendment equal-protection claims based on his allegation that in June 2018, defendant Wayne Primmer, a correctional sergeant, refused to permit Williams and the other Muslim inmates on his unit to attend WSPF's Eid al-Fitr feast. There is a genuine issue of material fact about whether Primmer intentionally prevented Williams from attending the feast, so I will deny defendants' motion for summary judgment on Williams's individual-capacity free-exercise claim against Primmer. I will also deny defendants' motion for summary judgment on the individual-capacity equal-protection claim, as there is a genuine dispute about whether Primmer acted with discriminatory intent towards Muslim inmates. But Williams's official-capacity free-exercise claim and RLUIPA claim are both moot, so I will grant defendants summary judgment on those claims.

**1.  Facts**

Eid al-Fitr is a Muslim holiday that celebrates the end of Ramadan. Inmates in DOC custody are given the option of signing up for an Eid al-Fitr congregate meal, which takes place shortly after the Ramadan fasting concludes each year. In 2018, WSPF's Eid al-Fitr feast was celebrated on June 15.

On the morning of June 15, Primmer was working as the sergeant in charge of the Foxtrot Unit, where Williams was housed. He recalls that several inmates asked him about "when they would be sent for Jumu'ah service." Dkt. 38, ¶ 7. Primmer told the prisoners that they would have to wait until he received a call from the chaplain that it was time. He says that no prisoner asked him about Eid al-Fitr. Williams disputes this and contends that multiple

inmates asked Primmer specifically about Eid al-Fitr, both in person and over their intercoms. Dkt. 53, ¶ 176 and Dkt. 54, ¶¶ 120, 121.

Primmer received a call that morning from a staff member "about sending inmates to the Native American Pipe and Drum service and to one other activity he had never heard of," which Primmer now believes was Eid al-Fitr. Dkt. 53, ¶ 175. He announced the pipe and drum service over the intercom but didn't say anything about the other activity because he "assumed there were no inmates who wanted to attend." *Id.* ¶ 177. (Primmer doesn't explain how he could be both ignorant of Eid al-Fitr and believe that no prisoners wanted to attend.) Primmer says that he didn't realize his mistake until he was informed by another prisoner that afternoon, but by that point the Eid al-Fitr feast had already concluded. But Williams says that when he spoke to Primmer about it later that day, Primmer admitted that "they called for you guys earlier, but I didn't feel like bothering with the Ramadan list on who was supposed to go." Dkt. 54, ¶ 126.

### 2. First Amendment free-exercise claim

Defendants contend that they are entitled to summary judgment on the free-exercise claim against Primmer because Primer's failure to send the inmates to Eid al-Fitr was at worst negligent, and negligence isn't enough to show a constitutional violation under 42 U.S.C. § 1983. *See Daniels*, 474 U.S. at 333–34. They analogize Primmer's situation to the facts in *Hambright v. Kemper*, 705 F. App'x 461, 462–63 (7th Cir. 2017), in which the court of appeals held that a prison cook couldn't be held liable under the First Amendment for failing to prepare an Eid al-Fitr meal because "he was not aware of any scheduled feast." *Id.* at 462.

*Hambright* would be on point if Williams weren't disputing Primmer's version of events. *See, e.g., Arroyo v. Boughton*, No. 18-cv-1055-jdp, 2020 WL 2849959, at *1–2 (W.D. Wis. June

30

2, 2020) (granting summary judgment to defendants on claims arising out of this same incident where plaintiff failed to oppose the motion for summary judgment). But at summary judgment, I must view the facts in the light most favorable to Williams. *See Scott v. Harris*, 550 U.S. 372, 378 (2007). Williams points to several pieces of evidence that preclude summary judgment.

First, Williams notes that Primmer has been a correctional officer with the Wisconsin Department of Corrections since 2005. Dkt. 41, at 11. As I noted in yet another case against Primmer arising out of this incident, "a substantial number of prisoners are Muslim, so it would be surprising if someone who had worked more than a decade in corrections had never even heard of a major Islamic feast day, as Primmer says." *Howard v. Primmer*, No. 18-cv-1043-jdp, 2020 WL 3403084, at *2 (W.D. Wis. June 19, 2020).[5]

Second, Williams contends that Primmer was made aware of the Eid al-Fitr celebration through numerous means, including two emails, a unit calendar, a newsletter, a phone call, and numerous inmates. Dkt. 54, ¶ 128. In his declaration, Primmer acknowledges that he received an email on June 14, reminding him that the "end of Ramadan EID Prayer is on Friday, June 15th at 8am." Dkt. 28-6. He says that he doesn't remember the email, so he may not have read it, or, if he did, he may not have understood what it meant. Dkt. 38, ¶¶ 13–14. Primmer is free to offer that testimony at trial, but the jury wouldn't be required to accept it. Primmer doesn't contend that he fails to read his email as a general matter, and he doesn't explain why the email would have been confusing.

Third, Williams offers testimony that directly contradicts Primmer's statement that no prisoner asked him about Eid al-Fitr. He provides declarations from two other inmates who say

---

[5] The parties in that case settled after I denied Primmer's motion for summary judgment.

that they approached Primmer in person on the morning of June 15 to ask about Eid al-Fitr. *See* Dkt. 45, ¶ 9; Dkt. 46, ¶ 9. Most important, Williams asserts in his own declaration that Primmer told him that he'd received a call about sending the Muslim inmates to Eid al-Fitr but "didn't feel like bothering with the Ramadan list on who was supposed to go." Dkt. 44, ¶ 182.

A reasonable jury could find that Primmer made a mistake, but a reasonable jury could also credit Williams's evidence suggesting that Primmer knew what Eid al-Fitr was and that his actions were intentional. So I will deny defendants' motion for summary judgment on the free-exercise claim.

### 3. Fourteenth Amendment equal-protection claim

I will deny defendants' motion for summary judgment on Williams's equal-protection claim against Primmer for similar reasons. Williams has shown that he was treated differently than the similarly situated Native American inmates whom Primmer permitted to attend their pipe and drum service on June 15. If a jury were to credit Williams's testimony that Primmer said that he "didn't feel like bothering with the Ramadan list," they could reasonably conclude that Primmer was acting with the intent of discriminating against Muslim inmates.

### 4. RLUIPA and official-capacity claims

As discussed above, the only type of relief available for claims under RLUIPA or against defendants in their official capacities is prospective relief, and to obtain prospective relief, there must be a risk that the defendant will violate the plaintiff's rights in the future. *See Lopez-Aguilar*, 924 F.3d at 395. The events at issue in this case occurred at WSPF, and Williams is now incarcerated at CCI. Primmer now works as a probation and parole officer and no longer supervises inmates. The chance of Primmer violating Williams's rights to free exercise or equal protection in the future is negligible. And Williams provides no evidence that denying Muslim

inmates the opportunity to attend Eid al-Fitr celebrations is a systemic, statewide problem as opposed to a one-time occurrence attributable to Primmer. I will therefore grant defendant's motion for summary judgment and dismiss the RLUIPA and official-capacity claims as moot.

## G. Prayer service held in sweltering gym

Williams's final claim concerns his allegation that Chaplain Goff retaliated against him for complaining about missing the Eid al-Fitr feast by scheduling the June 29, 2018 Jumu'ah service to take place in a non-air-conditioned gym during a heat advisory. Because Williams provides no evidence from which a reasonable jury could infer that Goff retaliated against him, I will grant summary judgment to defendants on that claim.

### 1. Facts

After Eid al-Fitr, Williams and several other Muslim inmates from the Foxtrot Unit submitted complaints about the incident with Primmer. Williams submitted an interview request to Goff on June 18, 2018, who wrote back to say that he was in the process of investigating why Primmer had refused to send the Foxtrot inmates to Eid al-Fitr. Dkt. 44-22.

Ten days later, on June 29, WSPF's Muslim inmates gathered for Jumu'ah in an indoor gym with no air conditioning. There was a heat advisory in effect that day, and temperatures in Boscobel reached 95 degrees Fahrenheit.

### 2. First Amendment retaliation claim

Williams contends that Goff ordered that the June 29 Jumu'ah service take place in the gym in retaliation for Williams's June 18 interview request. To survive summary judgment on his retaliation claim, Williams needs evidence that (1) he engaged in protected activity; (2) Goff took actions that would deter a person of "ordinary firmness" from engaging in the protected activity; and (3) Goff's actions were at least in part motivated by Williams's

33

protected activity. Here, there's no dispute that Williams engaged in protected activity. But he provides no evidence from which a reasonable jury could find that he meets the other two elements.

For starters, there is no evidence that Goff was the individual responsible for choosing the location of the June 29 Jumu'ah service. In his declaration, Goff states that because he was serving as the interim chaplain at that time, he did not decide where services would be held; rather, Chaplain Ewing had created the schedule prior to his retirement the month before. Dkt. 28, ¶ 27. Williams disputes this and insists that Goff was the responsible decision-maker, not Ewing. Dkt. 53, ¶ 201. But he cites no evidence to support this assertion other than the simple fact that Ewing had retired. That's not sufficient to create a genuine issue. Prison administration involves considerable advance planning, and schedules are often set weeks or months ahead of time.[6] The undisputed evidence shows that Goff wasn't the one who decided that Jumu'ah should take place in the gym that day, so he cannot be held liable under § 1983. *See Mitchell v. Kallas,* 895 F.3d 492, 498–99 (7th Cir. 2018) (a defendant must be personally responsible for the alleged deprivation of the plaintiff's constitutional rights to be liable).

Even if there were evidence that Goff were the decision-maker, Williams's claim would still fail because there's no evidence of any causal link between his June 18 interview request and the June 29 Jumu'ah service. Goff responded to Williams's interview request promptly and

---

[6] As interim chaplain, Goff did have authority to switch the June 29 Jumu'ah service to a different location. Goff says he wasn't aware of the heat advisory that day, but even if had been, he wouldn't have changed the location of the service. Under DAI Policy 300.00.03, when a heat advisory is in effect, prisons will cancel or modify only those activities that require physical exertion, such as strenuous sports or non-essential work involving physical activity. Williams doesn't dispute that Jumu'ah does not require physical exertion and wouldn't have been affected by the heat advisory under DAI policy, *see* Dkt. 53, ¶ 212, so Goff's failure to switch the Jumu'ah service to a different room doesn't raise an inference of retaliation.

assured him that he was looking into the Eid al-Fitr incident. Nothing about his response hinted at an invidious, retaliatory motive. In fact, once Goff learned what had happened with Eid al-Fitr, he contacted the inmate complaint examiner to tell him about it. *Id.* ¶ 207. These facts suggest that Goff was interested in getting to the bottom of the incident, not in punishing the inmates who had brought it to light.

In the end, Williams can do no more than speculate that WSPF's decision to hold Jumu'ah in a hot gym had something to do with his interview request. That's not enough to survive summary judgment, *see Springer*, 518 F.3d at 484, so I will grant summary judgment to defendants on Williams's retaliation claim against Goff.

## H. Conclusion

To summarize, I am granting summary judgment to defendants on all of Williams's claims except for the First Amendment free-exercise and Fourteenth Amendment equal-protection claims against defendant Primmer. The case will proceed to trial on those claims on October 13, 2020. To help Williams prepare for trial, I will issue a separate trial preparation order that provides detailed information about how trial works and how Williams should prepare.

That said, Williams should be aware that 42 U.S.C. § 1997e(e) does not allow prisoners to recover damages for emotional pain and suffering unless they suffered a physical injury. Because Williams didn't suffer a physical injury and it seems unlikely that he suffered any economic harm as a result of missing the feast, he will be limited to nominal damages of one dollar and punitive damages if he can meet the legal standard for that type of damages. To recover punitive damages, Williams will have to prove that Primmer acted with "evil motive or

intent" or with "reckless or callous indifference" to his First and Fourteenth Amendment rights.

*Smith v. Wade*, 461 U.S. 30 (1983).

## ORDER

IT IS ORDERED that:

1. Defendants' motion for summary judgment, Dkt. 25, is DENIED as to plaintiff Derek Williams's First Amendment free-exercise and Fourteenth Amendment equal-protection claims against defendant Wayne Primmer. Defendants' motion for summary judgment is GRANTED as to the remaining claims.

2. Defendants Gary Boughton, Trina Kroening-Skime, David Ewing, Daniel Goff, Laurie Neuroth, and Steven Meyer are DISMISSED from the case.

Entered August 4, 2020.

BY THE COURT:

/s/

_____
JAMES D. PETERSON
District Judge

36